UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM COLEMAN, | Civil Action No: |
| *Plaintiff,* | 10-cv-2613 (PGS)(TJB) |
| v. | |
| RAMON CAMACHO, *et al.*, | **MEMORANDUM AND ORDER** |
| *Defendants.* | |

Presently before the Court are Defendants' motions for summary judgment dismissing Plaintiff William Coleman's Amended Complaint. (ECF Nos. 131, 132). Plaintiff asserts a Fourth Amendment excessive force claim under 42 U.S.C. § 1983. (ECF No. 21), and Defendants assert that the doctrine of qualified immunity bars the suit. Initially, Plaintiff claimed that the officers utilized excessive force to arrest him and, as a result, several of his teeth were dislodged. Plaintiff could not identify which officer caused the injury to his teeth and, therefore, he listed the nine officers that were present at the scene. The nine officers sought dismissal based on the fact that Plaintiff could not identify any of the officers. Since no depositions of Defendants were taken during discovery, there was little or no evidence of what occurred at the arrest. As such, an evidentiary hearing on December 11 and 28, 2017 was undertaken,[1] and testimony from the Defendants police officers as well as from Plaintiff was heard. The police reports and the testimony are summarized below. Notably, in the Complaint Coleman alleges he lost several teeth; but at the evidentiary hearing, Coleman concedes that he lost four teeth in a subsequent incident

---

[1] The testimony is set forth in two transcripts. The December 11, 2017 transcript is referred to as "1T" and the December 28, 2017 transcript is referred to as "2T".

in March 2015 – that incident is not at issue in this case. For the reasons discussed herein, Defendants' motions will be granted.

## BACKGROUND

In late 2009, Plaintiff William Coleman was under investigation by the Long Branch Police Department (LBPD) for selling narcotics or controlled dangerous substances (CDS). (ECF No. 133, "Statement of Material Facts" [SOMF] at ¶ 3). Officers Camacho, Roebuck, Chaparro, and Coleman participated in the investigation as part of the LBPD's Street Crimes Unit.[2] (ECF No. 133-2, "Camacho Report" at 1). Based on their investigation, Camacho secured a "No Knock" warrant to search the premises of 232 Edwards Ave Rear, Long Branch, New Jersey, and a warrant to perform a body search of Coleman. (SOMF at ¶ 4). On December 7, 2009, the LBPD assembled a team to execute the warrants, which included Officers Camacho, Roebuck, Chaparro, Coleman, Blamer, Grippaldi, Shamrock, Pilone, and Polk. (*Id.* at ¶ 5; Camacho Report at 1). Having been informed that Coleman was distributing CDS in an apartment located at 468 Second Avenue, Apt. 13., LBPD set up surveillance near that location. (*Id.* at ¶ 6). At approximately, 11:56 p.m., Coleman exited a vehicle, carrying a white bag that was later discovered to contain 2470 decks of heroin, $3,920, two cell phones, and drug paraphernalia. (*Id.* at ¶¶ 7, 22).

Here, the parties diverge as to what happened next. According to Defendants, Polk confronted Coleman, as he was approaching the front porch of Apartment 13, and shouted, "police warrant!" (*Id.* at ¶ 8). As Polk reached towards Coleman, he took a step back, clenched his fist, and punched Polk in the face; Coleman then tried to push Polk away, at which point Polk shouted, "You're under arrest, stop resisting!" (*Id.* at ¶¶ 9-10). Coleman then dropped the white bag and proceeded to punch Polk in the head. (*Id.* at ¶ 11). As Shamrock arrived to assist Polk, the three

---

[2] For consistency's sake, the Court will spell the party's names as they appear in the police report.

2

fell off the porch step and onto the concrete path; while on the ground, Coleman got on top of Polk and began choking him. (*Id.* at ¶¶ 12-13). After Polk was able to break free from Coleman's grip, Coleman rolled onto his stomach and tucked his hands underneath his body, in an attempt to avoid arrest. (*Id.* at ¶¶ 14-15). At this point, the officers feared that Coleman may be armed, since one of Coleman's associates was recently murdered, and he believed that he may have been attempting to retrieve a concealed weapon. (*Id.* at ¶¶ 17-18). As such, Coleman was ordered to show his hands, which he refused to do. (*Id.* at ¶ 20). "After multiple commands to stop resisting and to show the officers his hands, Polk sprayed [Plaintiff] in the facial area with a short burst of [pepper] spray." (ECF No. 131, "Roebuck's SOMF" at ¶ 20). Eventually, LBPD to handcuffed Coleman and transported him to Monmouth Medical Center, where he and Polk were treated for injuries sustained during the confrontation. (*Id.* at ¶¶ 21, 27).

Coleman offers a different account of the arrest. At deposition, Coleman claimed that he was surprised by the police officers' presence; initially, he thought he was being robbed and "before [he] knew what was going on," he "was put onto the ground and punched several times upon [his] face and head." (ECF No. 133-4, "Coleman Deposition" at 35:11-13). According to Coleman, he was unconscious for much of the attack and only regained consciousness once at the hospital. He claimed that he believed he was being robbed because he had money on him and he overheard one of the officers say "give it here." (*Id.* at 36:14-23). During the struggle, Coleman claimed he tried to defend himself by covering his face with his hands and, while trying to cover himself, "was beaten with all kinds of weapons from sticks to batons to gun handles." (*Id.* at 40:12-41:6, 17-18). However, at no point was he able to identify which officers allegedly attacked him, or the number of officers that were present during the incident—though he claimed there were more than ten. (*Id.* at 35:16-36:7). According to Coleman, it was not until he arrived at the county

jail that he realized that the alleged "robbers" were police officers. (*Id.* at 39:14-24). As a result of the arrest, Coleman claimed in his deposition that he had lost two teeth, suffered a black and swollen eye, and bruises on his leg, shin and wrist. (*Id.* at 45:1-46:20).

To resolve the issue of qualified immunity, an evidentiary hearing was held on December 11, 2017. Camacho testified first. He explained that, prior to executing the warrant, he had some concern with confronting Coleman, because Coleman "had prior history of resisting arrest and attempting to disarm a law enforcement officer." (1T. at 9:21-25). Camacho then described the alleged assault. Camacho was positioned across the street from the apartment and, as Coleman exited the vehicle, observed Polk and Shamrock identify themselves as police officers with a search warrant. (1T. 12:8-17). Both were wearing their police uniforms, which Camacho described as "police pants, uniform, patch, it was blue, patch on the right, patch on the left" and tactical vests that had "POLICE" lettered across the front. (1T. at 12:20-13:3). By the time Camacho crossed the street, Coleman had been brought to the ground, with his hands tucked under his waistband. (1T. 13:12-17). When asked what he did to control the Plaintiff, Camacho explained, "I was towards like the head, I had a knee on his -- the mid-back of his shoulders . . . I was by his head shouting commands to him, 'we are the police', 'we have a search warrant', 'you're under arrest." (1T. 14:11-18). The whole struggle took about three minutes. (1T. 14:25).

Polk testified next. Like Camacho, Polk explained that, prior to executing the search warrants, the officers were briefed on Coleman's history, and that Coleman had been involved in multiple fights with officers in the past. (T. at 23:24-24:7). On the night of the incident, both he and Shamrock were positioned in the shrubs beside the apartment, wearing their police uniforms and tactical vests. (1T. 24:8-17). Polk then described how the altercation transpired:

4

> I stepped out from where I was, said, "police", "search warrant", and immediately he struck me on the right [s]ide of my face with his left hand, and then it was on from there; me and him traded blows back and forth.
>
> And then Sergeant Shamrock came – came from around the rear ... and we tried to get control of him from there, but there were several strikes to my face as you can see from the photos, several strikes to his face, and then ... we all went to the ground.
>
> And the – this wasn't your average fight, this was a violent struggle; this wasn't he's just resisting or he's not –kind of not fighting, he was actively fighting. When we fell – he's large, so when we fell he fell partially on top of me, he started grabbing me by the neck, hit me more times; at that time I was able to break free and I could see where this was going, we still didn't have him anywhere close to under control. So I sprayed him, temporarily sprayed myself also.

(1T. 25:5-23). Polk explained that pepper spray became necessary since initial attempts to subdue Coleman were ineffective. (1T. 28:3-7). Once Coleman was placed in handcuffs, Polk was taken to the hospital for treatment of the injuries he sustained during the fight. (1T. 32:9-12). Photographs of his injuries were also admitted during his testimony, which depict abrasions to the right side of cheek and jawline, and swelling below his right eye. (1T. 29:2-30:24; Exhibits 4-A-D). On cross-examination, Polk explained that he was the first to hit Coleman, in response to being punched; however, Polk denied ever hitting him once he was on the ground, though he did use pepper spray. (1T. 33:5-13).

Like Camacho and Polk, Shamrock testified that, on the night of the incident, he was wearing his police uniform and tactical vest. (1T. 36:23-25). Shamrock then explained his familiarity with Coleman: five years earlier, Shamrock and other LBPD officers attempted to execute a warrant against Coleman, at which point Coleman proceeded to start fighting another officer, Defendant Pilone, and attempted to remove Pilone's gun from his holster. (1T. 37:8-38:6). Turning to the night in question, Shamrock testified that he was Polk's cover, and followed behind him as he approached Coleman at the front porch of the apartment. (1T. 41:21-23). He explained,

5

"[a]s Officer Polk tried to stop [Coleman] from getting into the apartment, Coleman just squares up right away and throw[s] a left hook, and clipped [Polk] in the right side of the face." (1T. 41:21-23). At that point, Shamrock rushed to Polk's aid and tried to grab a hold of Coleman's left arm. (1T. 42:1-7). According to Shamrock, Coleman shoved him aside and began "teeing off on Officer Polk," "[j]ust both hands going back and forth, throwing punches." (1T. 42:13-18). At this point, Shamrock took out his baton and struck the back of Coleman's left leg five or six times, as a method of pain compliance. (1T. 42:25-43:5). Soon thereafter, Defendant Balmer joined in the melee, trying to grab Coleman; in doing so, the four fell off the porch and onto the ground. (1T. 43:7-12). Shamrock lost his baton during this scuffle.

Once on the ground, however, Coleman again got a hold of Polk, this time choking him. (1T. at 43:13-18). Upon seeing this, Shamrock – now without his baton – began punching Plaintiff five to six times in the face, which ultimately helped Polk break free from Coleman's grip. (1T. at 44:11-20). At this point, Coleman spun onto his stomach, tucking his hands underneath his waistband. (1T. at 44:22-45:2). Like Camacho and Polk, Shamrock was concerned that Coleman was attempting to locate a concealed weapon; at which point he and Balmer got atop Coleman, placing their weight on his body, in an attempt to calm him. (1T. at 45:5-46:7). While still struggling to take control of Coleman, Shamrock was able to retrieve his baton and again struck the back of Coleman's leg another four times, in order to pull his hands out from underneath him. (1T. at 47:5-8). According to Shamrock, the whole incident took three minutes. (1T. at 47:12). On cross-examination, Shamrock denied ever hitting Coleman anywhere besides his legs with the baton and conceded that he was the only one to have taken his baton out during the altercation. (1T. at 50:7-8, 15). Shamrock also conceded that he and Polk were the only two that he recalled

punching Coleman; however, he also claimed he was not aware that Coleman's teeth were damaged during the incident. (1T. at 50:21-22).

Finally, Roebuck provided essentially the same testimony as that described above. Roebuck was positioned on the northwest side of the apartment, with Balmer. (1T. 58:4-6). Upon seeing Polk and Shamrock engaged in a fight with Coleman, the two officers joined in; according Roebuck, as Balmer attempted to grab Coleman's legs and waist, they all then fell to the ground. (1T. 59:4-8). As the struggle continued on the ground, Roebuck yelled for an officer to spray Coleman; however, he could not recall if Polk sprayed him before or after he made this order. (1T. 59:16-21). This being said, Roebuck testified that he never struck Coleman, that Coleman never lost consciousness, and that he did not notice that Coleman's teeth had been knocked out. (1T. 59:22-23; 1T. 60:15-16; and 1T. 63:21-22).

Coleman testified that, on the night in question, he arrived at Apartment 13 for purposes of selling and using drugs. (2T. 5:10-16). As he was walking towards the apartment, he claims that he was attacked from behind, tackled to the ground, and kicked and punched with hard objects. (2T. 6:2-13). According to Coleman, at no point did any of the officers identify themselves as police or that he was under arrest; he also claims that he lost consciousness after five minutes. (2T. 6:7-10, 22-24). For the bulk of the confrontation, Coleman claims he was positioned on his back, with his hands covering his face. (2T. 7:3-5, 17-18). Plaintiff avers that he was never told to "stop resisting," he never reached for his waistband, he did not have any weapons on him, and he never fought back. (2T. 9:1-15). When asked to identify the injuries he sustained, Coleman claimed his eyes were swollen, his back and legs were bleeding, and he lost one tooth. (2T 8:11-20). On cross-examination, Coleman conceded that he had previously fought with LBPD officers. (2T. 11:2-3). He also denied ever punching Polk. (2T. 12:12-13).

7

Based on Coleman's deposition testimony, the Court was under the impression that he had sustained significant injuries including the loss of two teeth. However, at the evidentiary hearing, Coleman conceded that he did not report this injury when he arrived at the hospital for treatment, and the medical records do not reflect any loss of teeth. (2T. 13:13-25).

## LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; S*iegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657

(3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor...that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 F. App'x 222, 227 (3d Cir. 2007).

## ANALYSIS

"Section 1983 authorizes a person to file a private cause of action against state actors for a deprivation of rights protected by a federal statute or the United States Constitution." *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002). Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

*Id.* To sustain a claim under Section 1983, a plaintiff must demonstrate: (1) "that they have been deprived of a right 'secured by the Constitution and the laws' of the United States"; and (2) that the defendant "deprived them of this right acting 'under color of any statute'" or state law. *Flagg Bros, Inc. v. Brooks*, 436 U.S. 149, 155 (1978). Here, neither party disputes that Defendants acted under the color of state law. As such, the sole issue before the Court is whether Defendants violated a protected right. In moving for summary judgment dismissal of Plaintiff's excessive force claim, Defendants seek to invoke the doctrine of qualified immunity. Plaintiff responds, contending that Defendants are not entitled to qualified immunity since they used excessive force and acted unreasonably in their arrest.

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The principle applies if the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (citing *Butz v. Economou*, 438 U.S. 478, 507 (1978)). In determining whether qualified immunity applies, courts must engage in a two-step inquiry: (1) "do the facts alleged show the officer's conduct violated a constitutional right"; and (2) was this right "clearly established" at the time of the alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may address the elements in whichever order they see fit. *See Pearson v. Callahan*, 555 U.S. 223, 235 (2009). At the summary judgment stage, the burden remains on the party claiming the qualified immunity defense, here being Defendants. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014); *see also, Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010). In determining whether Defendants are entitled to qualified immunity, the Court first examines Coleman's Section 1983 excessive force claim.

The Supreme Court has held that claims alleging excessive force must be analyzed "under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). Through this "objective reasonableness" lens, courts must consider the circumstances from the officer's "on-scene perspective," not "20/20 vision of hindsight." *Saucier*, 533 U.S. at 205. Under Section 1983, excessive force exists "when a law enforcement officer uses force so excessive that it violates the *Fourth* and *Fourteenth Amendments*." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633-34 (3d Cir. 1995). A police officer must use reasonable force in order to

10

effectuate an arrest. *Graham*, 490 U.S. at 395-97. To determine reasonableness, courts should consider:

> (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "whether he is actively resisting arrest or attempting to evade arrest by flight," [*Graham*, 490 U.S.] at 396, (4) "the possibility that the persons subject to the police action are themselves violent or dangerous," (5) "the duration of the action," (6) "whether the action takes place in the context of effecting an arrest," (7) "the possibility that the suspect may be armed," and (8) "the number of persons with whom the police officers must contend at one time."

*Sharrar v. Felsing*, 128 F.3d 810, 821-22 (3d Cir. 1997). The inquiry should be objective, viewed from the perspective of a reasonable officer at the scene. *Graham*, 490 U.S. at 395-97. As noted above, the Court is to assess the objective reasonableness of the Officers by considering the eight factors listed above. Each factor is discussed below.

1. The severity of the crime at issue – Here, the search warrants were issued because Coleman was allegedly distributing controlled dangerous substances from a Second Avenue apartment. This is a very heinous crime.

2. Whether the suspect poses an immediate threat to the safety of the officers or others – Here, Polk was advised, at a briefing before the stake-out, that Coleman had been involved in multiple fights with police. The officers feared that Coleman may have been armed, since one of Coleman's associates was recently murdered. Shamrock also recalled another fight involving Coleman, where he attempted to remove a fellow officer's (Pilone) handgun from his holster. Based on that known history, Coleman was considered to be a threat to the safety of the officers.

3. Whether he is actively resisting arrest or attempting to evade arrest by flight – Here, Coleman actively resisted by punching Officer Polk and wrestling him to the ground. Although Coleman claims this is untrue, there are photos and a hospital report documenting Polk's injuries.

4. The possibility that the persons subject to the police action are themselves violent or dangerous – The facts disclosed in paragraphs one and two above apply here.

5. The duration of the action – Several of the officers indicated that the fight lasted about three minutes. The encounter quelled the incident. It certainly was not a brutal beating by the officers over an extended period of time.

6. Whether the action takes place in the context of effecting an arrest – Here, the police were effecting two warrants, one to search the apartment and another to search Coleman.

7. Whether there is the possibility that the suspect may be armed – Here, as noted in paragraph two above, the police feared that Coleman may have been armed, based on his prior encounters with LBPD, and the recent murder of one of his associates.

8. The number of persons with whom the police officers must contend at one time – This is not a factor here.

Based on the above analysis, the police acted with objective reasonableness under the circumstances. Moreover, no lethal weapons were used, and the moderate increase of force after Coleman's resistance to pepper spray and baton was appropriate, given all of the adverse circumstances discussed above. "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)). In sum, when considering the totality of the circumstances, no trier of fact, if presented with this record, could reach any conclusion but that Polk and Shamrock's conduct, as well as the remaining officers, was objectively reasonable as well. The officers are entitled to qualified immunity, and summary judgment is granted as to the claims against them.

With regard to Officers Camacho, Roebuck, Chaparro, Coleman, Balmer, Grippaldi, and Pilone, the record fails to demonstrate any conduct that would be considered unreasonable or excessive. First, as it relates to Defendants Chaparro, Coleman, Grippaldi, and Pilone, there is no evidence presented that suggests that any of these officers made physical contact with Coleman, let alone used force. Second, with regards to Defendants Camacho, Balmer, and Roebuck, the force allegedly used, was restricted to placing a hold of Coleman and pinning him to the ground, in an attempt to effectuate the arrest. However, when considering the fact that the officers suspected Plaintiff of dealing illegal drugs, along with his violent history with the LBPD and the possibility that he may have been armed, the Court is satisfied that no reasonable factfinder would believe this conduct to be unreasonable or excessive.[3]

## ORDER

IT IS on this 26th day of March, 2018,

**ORDERED** that Defendants' Motions for Summary Judgment (ECF Nos. 131, 132) are **GRANTED**; and it is further

**ORDERED** that the clerk of the court is directed to close the case.

_____
PETER G. SHERIDAN, U.S.D.J.

---

[3] The Court rejects Plaintiff's response to the extent he now argues that Defendants remain liable based on a failure to intervene theory. Neither the Amended Complaint nor Plaintiff's deposition alleged that Defendants were in a position to intervene, yet declined to do so. More importantly, this Court's prior decision narrowed the issue presented to whether Defendants were liable for using excessive force. (ECF No. 109 at 2). As such, Summary Judgment will not be denied based on Plaintiff's newly minted failure to intervene theory. *See Carr v. Gillis Associated Indus.*, 227 F. App'x 172, 176 (3d Cir. 2007) ("Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour.").